IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HEATHER NELSON, Individually and as Personal Representative for the Estate of JONATHAN E. NELSON, deceased,<br><br>        Plaintiff,<br><br>v.<br><br>JOHNSON & JOHNSON,<br><br>JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a Johnson & Johnson Consumer Inc., individually and successor in interest to Johnson & Johnson subsidiary "Old JJCI";<br><br>KENVUE INC., individually and as successor in interest to Johnson & Johnson Consumer Inc.;<br><br>JANSSEN PHARMACEUTICALS, INC., individually and as successor in interest to Johnson & Johnson subsidiaries named Johnson & Johnson Consumer Inc., both prior to and after its 2021 restructurings and colloquially known as "Old JJCI" and "New JJCI";<br><br>LLT MANAGEMENT, LLC,<br><br>LTL MANAGEMENT LLC,<br><br>        Defendants. | CASE ID:_____<br><br><br><br>COMPLAINT AND JURY DEMAND |

1.      Plaintiff, HEATHER NELSON is a resident of Gretna, Nebraska and a citizen of Nebraska.

2.      At the time of his death, decedent JONATHAN NELSON, was a resident of Gretna, Nebraska and a citizen of Nebraska.

3.      Both Plaintiff HEATHER NELSON and Decedent JONATHAN NELSON's

1

domicile is in the State of Nebraska.

4.     Decedent, JONATHAN NELSON (hereinafter "NELSON" or "DECEDENT") was diagnosed as having an asbestos-related disease, specifically, mesothelioma.

5.     Decedent has an asbestos claim pursuant to Neb. Rev. Stat. 25-21,284, et. seq.

## JURISDICTION AND VENUE

6.     Decedent was a resident of Nebraska when he encountered asbestos as a result of the Defendants' conduct.

7.     Personal jurisdiction is proper over Defendants pursuant to Neb. Rev. Stat. 25-536 because Defendants transacted business in Nebraska, contracted to supply services or products in Nebraska, caused a tortious injury in Nebraska, and has other contacts that afford a basis to exercise personal jurisdiction in Nebraska.

8.     Venue is proper in Nebraska because the injury complained of occurred in Nebraska and no other venue will be more convenient to litigate this matter.

9.     Jurisdiction is proper in this Court because the parties are all citizens of different states and the amount in controversy exceeds $75,000.00. 28 U.S. Code Sec 1332(a).

10.     Defendant, JOHNSON & JOHNSON (hereinafter "J&J") is doing business at One Johnson & Johnson Plaza, New Brunswick, NJ. At all relevant times, J&J conducted business in Nebraska and sold products that contained asbestos that were used by NELSON.

11.     At all relevant times, upon information and belief, J&J, or its corporate subsidiaries, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Plaintiff was exposed. At all relevant times, J&J regularly transacted, solicited, and conducted business in all fifty States of the United States.

2

12.    Defendant Johnson & Johnson Holdco (NA) Inc. (hereinafter "HOLDCO") is doing business at 199 Grandview Road, Skillman, NJ 08558. At all relevant times, HOLDCO conducted business in Nebraska and sold products that contained asbestos that were used by NELSON.

13.    At all relevant times, upon information and belief, Holdco, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Plaintiff was exposed. At all relevant times, Holdco regularly transacted, solicited, and conducted business in all fifty states of the United States.

14.    Defendant Kenvue Inc. ("KENVUE") is doing business at 199 Grandview Road, Skillman, NJ 08558. At all relevant times, KENVUE conducted business in Nebraska and sold products that contained asbestos that were used by NELSON.

15.    At all relevant times, upon information and belief, Kenvue, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Plaintiff was exposed. At all relevant times, Kenvue, or its predecessors, regularly transacted, solicited, and conducted business in all fifty States of the United States.

16.    Defendant Janssen Pharmaceuticals, Inc. ("JANSSEN") is doing business at 1125 Trenton-Harbourton Road, Titusville, NJ 08560. At all relevant times, JANSSEN conducted business in Nebraska and sold products that contained asbestos that were used by NELSON.

17.    At all relevant times, upon information and belief, Janssen, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Plaintiff was exposed. At all relevant times, Janssen regularly transacted, solicited, and conducted business in all fifty states of

3

the United States.

18.     Defendant LLT MANAGEMENT LLC (hereinafter "LLT") is doing business at 501 George Street, New Brunswick, NJ. At all relevant times, LLT conducted business in Nebraska and sold products that contained asbestos that were used by NELSON.

19.     Although other Defendants in this Complaint have acquired the assets and continued the business operations pertaining to PRODUCTS, LLT is a responsible Defendant and sued herein as LLT and the other Defendants have each asserted and acknowledged as between themselves that LLT has also assumed the liabilities for those PRODUCTS and claim that LLT is a party responsible and liable to Plaintiff for their injuries.

20.     Defendant, LTL MANAGEMENT LLC (hereinafter "LTL") is doing business at 501 George Street, New Brunswick, NJ. At all relevant times, LTL conducted business in Nebraska and sold products that contained asbestos that were used by NELSON.

21.     Although other Defendants in this Complaint have acquired the assets and continued the business operations pertaining to PRODUCTS, LTL is a responsible Defendant and sued herein as LTL and the other Defendants have each asserted and acknowledged as between themselves that LTL has also assumed the liabilities for those PRODUCTS and claim that LTL is a party responsible and liable to Plaintiff for their injuries.

22.     Defendants J&J, Holdco, Kenvue, Janssen, and LTL may hereinafter be collectively referred to as the "J&J Defendants" at times in this Complaint.

23.     Defendants as used in this Complaint refers to and means Defendants J&J, Kenvue, Janssen, Holdco, LLT, and LTL parties, either or both in its own right or as a corporate successor to an entity or person whose acts, omissions, undertakings, or activities are attributed to it by contract or operation of law.

4

24.     The Defendants named and identified herein are either (a) corporations organized under the laws of the various states of the United States of America that were and are doing business in the State of Nebraska that mined, milled, manufactured, sold, supplied, distributed, purchased, and/or marketed asbestos-containing PRODUCTS to which Plaintiff was exposed; or (b) are a successor in interest of such corporations described in clause "(a)" which the law holds responsible and liable for injuries and harm caused by their predecessor(s) or by their predecessor's asbestos-containing product lines it or they acquired which, as a consequence, renders them liable under law to the Plaintiff for the injuries and damages that are the subject of this suit.

25.     Each Defendant acted at all times material herein by and through their respective or joint actual, apparent, or ostensible agents, servants, employees, and/or officers, each and all of whom were acting under, pursuant and in accordance with their authority or duties, actual, apparent, or ostensible.

## FACTS

26.     Decedent was exposed to asbestos and asbestos products that were mined, processed, supplied, manufactured, and distributed by the Defendants or their predecessors.

27.     Decedent, NELSON was exposed to asbestos-contaminated talc from approximately 1979 through 2020 on a regular and frequent basis through the use of Johnson & Johnson's talc products.

28.     Dust particles and fibers from Johnson & Johnson's and its corporate subsidiaries' asbestos-containing talc products came in contact with and permeated Plaintiff's person and clothing.

29.     As a direct and proximate result of Plaintiff's exposure to and inhalation and ingestion of dust particles and fibers, Plaintiff was diagnosed with mesothelioma on or around

5

November 4, 2021.

30.     Each Defendant named above, at all times relevant, compounded, converted, designed, imported, installed, manipulated, manufactured, mined, processed, removed, required the use of, specified the use of, supervised the use of, used, sold, or supplied asbestos or products containing asbestos.

31.     This case was included in a tolling agreement with Johnson & Johnson, LTL Management LLC, and/or their current or past affiliates, which upon information and belief includes Kenvue, Holdco, Janssen and LLT. This tolling agreement was created to toll any statute of limitations as to Johnson & Johnson after their second bankruptcy was dismissed.

**FACTS RELATING TO DEFENDANTS' SUCCESSOR LIABILITY STATUS**

a.     **The Assets and Business of JJCI Were Transferred to Defendants**

32.     The Declaration of John K. Kim in Support of First Day Pleadings in LTL's second Bankruptcy filing on April 4, 2023 ("Kim LTL Decl."), *In re: LTL Management LLC*, Case No.: 23-12825, United States Bankruptcy Court District of New Jersey ("LTL 2"), summarizes J&J's and its affiliates' corporate history that is pertinent to the claims alleged herein against the Defendants as follows:

    a.     "J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products."

    b.     "In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder.... J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products."

    c.     "In 1981, J&J Baby Products transferred all its assets, except those assets

6

allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company."

d.  "In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc."

e.  "In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson & Johnson Consumer Companies, Inc. ("J&J Consumer Companies")."

f.  "In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI")."

g.  "Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases…. Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, cause cancer or other diseases."

33.     J&J and its subsidiary, "Johnson & Johnson Consumer, Inc.," both in the form of "Old JJCI" and "New JJCI" (which is identified and described below), were at all times materially responsible for the design, labeling, marketing, distribution, and sale of J&J's body powder

7

product lines, including the iconic Johnson & Johnson Baby Powder product line.

34.     Each and every one of the J&J's corporate entities, including itself and its affiliated companies involved or associated with talc business and products, were at all times material to this case aware that raw talc ingredient and/or resulting talc-based products contained asbestos, and each and all collectively actively concealed such fact from the public for decades.

35.     Prior to the implementation of J&J's multifaceted restructuring of its consumer product subsidiaries in 2021, Old JJCI and its predecessors milled, manufactured, labeled, sold, supplied, distributed, and/or marketed asbestos-containing products to which Plaintiffs and/or Decedents were exposed.

36.     In an effort to avoid or eliminate J&J's and Old JJCI's respective responsibility and liability for injuries and harm caused by Johnson & Johnson Baby Powder, as well as other talc products, in or about October 2021, Old JJCI underwent a series of corporate restructuring transactions under Texas state corporation and business law in which it split itself into two separate entities through a device referred to as a "divisive merger," more commonly known as the "Texas Two Step."

37.     The corporate restructuring was designed and undertaken with the intent to isolate the talc liabilities of Old JJCI into a newly invented company created by J&J called "LTL Management LLC" ("LTL"). "LTL" is an acronym for "Legacy Talc Liability."

38.     LTL was immediately thereafter put into a Chapter 11 Bankruptcy wherein LTL and other J&J entities sought the protection of the Bankruptcy Code's processes and machinery to obtain a stay of all pending litigation and construct an aggregate resolution of its outstanding present and future asbestos liabilities that would foreclose jury trials and reduce the compensation they would owe to those harmed by its products and their families, given that J&J and its

8

subsidiaries were increasingly being held liable by juries in lawsuits brought by talc asbestos claimants and were being ordered to pay compensatory and exemplary damages.

39.     On December 29, 2023, Johnson & Johson created a subsidy of LTL Management LLC with the same corporate address in Texas named LLT Management LLC.

40.     As part of J&J's liability avoidance/limiting corporate restructuring, all of the productive assets of Old JJCI, including those used to manufacture and market J&J Baby Powder, were transferred to a newly minted corporate entity named "Johnson & Johnson Consumer Inc." ("New JJCI"). New JJCI upon receipt of the Old JJCI's operating assets continued to sell J&J Baby Powder, as had Old JJCI before it.

41.     Over the objection of tens of thousands of personal injury and wrongful death tort plaintiffs, the Bankruptcy Court presiding over LTL's 2021 bankruptcy case stayed and enjoined prosecution of all litigation against not only the Debtor LTL but all cosmetic talc injury related litigation involving J&J and New JJCI.

42.     During LTL's bankruptcy proceedings, representatives of the affected personal injury and wrongful death tort victims challenged J&J's Texas Two Step scheme before the Bankruptcy Court. After losing their challenges before the Bankruptcy Court, they were ultimately successful on appeal before the United States Court of Appeals for the Third Circuit, which on January 30, 2023, ruled that the Bankruptcy filing by LTL was not proper and ordered that LTL's 2021 Bankruptcy case be dismissed. *In re: LTL Management, LLC*, No. 22-0007, 2023 WL 2760479 (3d Cir., decided Jan. 30, 2023; opinion entered Mar. 31, 2023).

43.     LTL's efforts to obtain re-argument before the Third Circuit panel hearing its appeal or an *en banc* hearing were denied, and the Appeals Court's mandate to the Bankruptcy Court was issued by the Third Circuit Clerk on March 31, 2023, thereby triggering the lower

court's duty to enter an order dismissing the case.

44.     Within hours of the LTL Bankruptcy Court issuing its ensuing dismissal order on April 4, 2023, LTL filed a second Chapter 11 petition for bankruptcy protection in the same court seeking the same relief as in the dismissed case, claiming its funding sources and arrangements had been replaced and reconfigured in such way that purportedly overcomes the Third Circuit's reasons for ordering the earlier bankruptcy case be dismissed.

45.     Unbeknownst to Plaintiffs, during the time the Third Circuit Court of Appeals was considering the propriety of LTL's bankruptcy filing, New JJCI began the process of moving its assets and business to yet another J&J subsidiary, Defendant Kenvue Inc., by transfers through JJCI's direct parent, Defendant Janssen Pharmaceuticals, Inc.

46.     According to the Kim Declaration, as part of J&J's further corporate restructuring, New JJCI changed its name to "Johnson & Johnson Holdco (NA) Inc." ("Holdco"), a New Jersey corporation. His declaration before the Bankruptcy Court additionally revealed that "in early January 2023, [New JJCI] transferred its Consumer Business assets to its parent entity." *See* Kim LTL Decl. at ¶26.

47.     While Mr. Kim's declaration does not expressly state who the parent entity is, a careful examination of the affidavit demonstrates that Janssen Pharmaceuticals, Inc, is the parent entity of New JJCI. *Id.* Figure 1 below is from an Exhibit to Mr. Kim's Declaration and shows that Janssen is the parent that received all of the JJCI assets used to manufacture, market, and sell J&J Baby Powder.

[ Remainder of page intentionally left blank]

Figure 1



48.     Accordingly, under Nebraska law, Janssen is a successor to Old JJCI and responsible for the contractual undertakings and tortious conduct of Old JJCI.

49.     The information gleaned from Mr. Kim's Declaration and a J&J subsidiary's SEC filings shows that J&J is in the process once again of manipulating assets and responsibilities related to the sale of J&J's Baby Powder.

50.     On January 4, 2023, Defendant Kenvue, another J&J subsidiary, submitted its first filing with the Securities and Exchange Commission ("SEC"), an S-1 registration of securities form. (Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023)). Figure 2 below reproduces a portion of the filing's cover page.

Figure 2



51.     Kenvue acknowledged in its SEC S-1 filing that it may be held accountable for the harm caused by the talc-based products it is responsible for: "It is also possible that various parties will seek to bring **and will be successful** in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." *Id.*

52.     Kenvue further acknowledged itself as the company responsible for the manufacture of Johnson's Baby Powder indicating that it "may be subject to additional claims . . . related to the sale of **talc-based Johnson's Baby Powder in markets where we have discontinued** this product (**such as in the United States** and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general." *Id.* (emphasis added).

53.     Kenvue also acknowledged that it is "responsible for all liabilities on account of or relating to harm arising out of, based upon, or resulting from, directly or indirectly, the presence of or exposure to talc or talc-containing products sold outside the United States or Canada." *Id.*

54.     As such, Kenvue is responsible individually and as successor to all predecessor entities involved in the manufacturing, marketing, and sale of the asbestos-containing talc products

12

to which the Plaintiffs and/or Decedents were exposed.

**b.    Defendants Continue the Business of JJCI, Including the Johnson's Baby Powder Product Line**

55.     In its SEC registration filing, Kenvue sets forth the products that it claims to manufacture and sell in the United States. In this regard, Kenvue represented to the SEC and the public: "A number of **our products marketed in the United States,** including many of our products in our Skin Health and Beauty segment, are considered cosmetics regulated by the FDA through the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act. **Our cosmetic products include** Aveeno Restorative Skin Therapy Oat Repairing Cream, Aveeno Restorative Skin Therapy Sulfate-Free Body Wash, **Johnson's Baby Powder** and certain of our Listerine mouthwash products." (Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023)). (emphasis added).

56.     The bottle for the cornstarch-based formulation Johnson's® Baby Powder, which is sold today in the United States, states: "For over 125 years JOHNSON's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!"

Figure 3

57.     Kenvue admits in its SEC filing that while J&J transitioned to a cornstarch-based formula for Johnson's® Baby Powder in the United States and Canada in 2020, it is still distributing talc-based Johnson's® Baby Powder in other markets and will continue to do so until sometime in 2023. *Id*. at 63, 330.

58.     It remains possible today, through Amazon's online shopping website, to purchase talc-based Johnson's Baby Powder and have it delivered to New Jersey. (Transcript of Motions May 24, 2023, Naranjo, et. al., v. Johnson & Johnson, et al., Vol. 1 of 2, at 44:18-45:10).

59.     Kenvue's website lists Johnson's as one of its "iconic brands" under the categories of "Skin health & Beauty – Face & body" and "Essential health – Baby care". https://www.kenvue.com/brands.

60.     Following the link to the Johnson's brand page, one finds Johnson's Baby Powder, amongst a variety of baby care products. https://www.johnsonsbaby.com/baby-products.

61.     On Kenvue's Johnson's brand website's FAQ page, under the questions "Why did Johnson's® reformulate?" and "How have the Johnson's® products changed?" Kenvue indicates it has generally reformulated its line of Johnson's baby products recently based on its continued scientific research and input from parents. https://www.johnsonsbaby.com/faq#why-did-johnson-s-reformulate and https://www.johnsonsbaby.com/faq#how-have-the-johnson-s-products-changed. As with its corn-starch-based Johnson's Baby Powder, Kenvue continues to market these reformulated products under the trusted Johnson's brand name.

## FACTUAL ALLEGATIONS

### A.    OVERVIEW OF TALC AND PRODUCTS

62.     Talc is an inorganic magnesium silicate mineral that may occur in a variety of forms

(massive or platy, foliated, and fibrous).

63.     Talc is used in a wide array of industrial, commercial, and cosmetic substances. It is the main substance in talcum powders, talc-based body powders, and the PRODUCTS.

64.     Talc is mined from deposits in the earth that can contain asbestos, heavy metals (nickel, cadmium, cobalt, chromium, arsenic, etc.), and other toxic minerals.

65.     Defendants acting as aforesaid manufactured and marketed Johnson's Baby Powder ("JBP") and Shower to Shower.

66.     J&J began the manufacture of Johnson's Baby Powder in approximately 1894.

67.     In the late 1970s, J&J incorporated a new division that over several name changes became Johnson & Johnson Consumer Inc. ("JJCI"), which sold Johnson's Baby Powder.

68.     Although JJCI manufactured and marketed the product, starting in the late 1970s, J&J was involved in critical decisions concerning safety and health including marketing, public relations, interaction with federal authorities, fraudulent concealment, and the refusal to warn people like the Plaintiff that J&J's talc PRODUCTS were capable of causing cancer.

69.     J&J in conjunction with and as the authorized spokesperson, representative and agent for Defendants made representations to federal authorities and the consuming public concerning the safety of Defendants' PRODUCTS.

70.     Defendants and J&J, at all times relevant hereto, represented to consumers, doctors, regulators, and courts that JBP and other talc PRODUCTS were safe and free of asbestos.

71.     During all relevant times, JBP was composed primarily of talc along with other constituent elements found in talc such as asbestos, fibrous talc, heavy metals (e.g., nickel, cadmium, cobalt, chromium, arsenic), and fragrance chemicals.

72.     The Defendants obtained the talc for Johnson's Baby Powder and other talc

PRODUCTS from various sources including Guangxi, China, the Fontana mine in the Germanasca Valley and Val Chisone region in Italy, as well as the Johnson, Hammondsville, Rainbow, Hamm, and Argonaut mines in Vermont (collectively referred to as "Vermont mines"). *See* 2/15/2019 Deposition of Musco 63:7–64:5 (Hammondsville and Johnson mines were sources of cosmetic talc for Johnson's Baby Powder); *see also* 3/8/2019 Deposition of Nancy Musco 451:2-453:22 (Emtal 500 from Johnson Mine used in Cosmetics); 10/29/1982 Deposition of Roger Miller; 7/22/2019 Trial Testimony of John Hopkins *Barden et al. v. Johnson & Johnson* at 18:15-19:21.

73.     From approximately 1967 until 2003, the primary source of talc for the PRODUCTS was Vermont mines including the Hammondsville, Rainbow, Hamm, and Argonaut mines. The mines were owned and operated by J&J's subsidiary, Windsor Minerals, with J&J exercising control over all key decisions concerning the mines.

74.     Over time, the trade names for the talc ore used by J&J and the Defendants in Johnson's Baby Powder and Shower to Shower included "Emtal," "Grade 66," "Grade 96," "1615," "Italian 00000," and "Supra," all of which contain asbestos.

75.     At all relevant times, a feasible and safe alternative to talc has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects. Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness as talcum powders. *See* Johnson & Johnson Baby Powder Questions and Answers, October 1985 (JNJ 000011777); cornstarch "can be absorbed into the body, tending not to cause severe granuloma as may be the case with talc." November 3, 1964 Letter to Ashton from Stalker (JNJ 000332195); *see also* Johnson's Baby Powder, pure cornstarch, being marketed as "a change for the better."

76.     At relevant times, J&J and the Defendants advertised and marketed their

"Johnson's Baby Powder" product as a symbol of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" to keep skin feeling dry and comfortable, and "clinically proven gentle and mild." J&J and the Defendants induced people through advertisements to dust themselves with this product to mask odors. Johnson's Baby Powder bottle specifically targets women, stating: "For you, use every day to help feel soft, fresh, and comfortable." *See* P-121 (excerpts from www.johnsonbaby.com and www.showertoshower.com); Shower to Shower Task Force – BP Brainstorm July 14, 2004 (JNJ 000058760); P-49 (picture of Johnson & Johnson's Baby Powder bottle).

77.     Although the labels on the bottles for J&J Baby Powder have changed over time, the core message has been the same: that people can safely use the PRODUCTS on their bodies.

**B.     ASBESTOS AND OTHER CONSTITUENTS IN TALC**

78.     The PRODUCTS contain asbestos and fibrous talc, and Defendants failed to warn the public, including Plaintiff, about the fact that the PRODUCTS contained such carcinogenic substances.

79.     Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos. Over the next several decades, a growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer, and death.

80.     The United States Geological Survey on Commercial Talc Production conducted in 1965, as well as those dating back to the 1800s, noted the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

81.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits like those mined by Defendants for use in the PRODUCTS. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that these positive results or the brand names of contaminated PRODUCTS were communicated to any governmental agency, the media, or the public. The study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum PRODUCT, 29 AM. INDUSTRIAL HYGIENE ASSOC. J. 350-354 (1968).

82.     In 1971, the New York City Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction analysis ("XRD") and found them to contain 5-25% tremolite and anthophyllite asbestos fibers.

83.     A 1976 follow-up study of commercially available talcum products concluded that

"[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J. Tox. Envtl. Health 255-284 (1976).

84.     In 1981, Lockey, in *Nonasbestos fibrous materials* (1981), reported that talc frequently exists in complex deposits containing quartz and asbestos and that talc free from asbestos also contains talc in fibrous form.

85.     Paoletti et al. *Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial,* Cosmetic*, and Pharmaceutical Talcs* (1983), analyzed talc powders from national and international markets in order to assess their fiber contents and the proportion of asbestos in the fibrous material. Analysis of talcum powder samples revealed that the powders contained fiber content up to 30% of total particles. About half of the talc powders revealed the presence of asbestos.

86.     In 1991, Alice Blount tested talcum powder mined from Vermont, including Johnson's Baby Powder, and found that the powder contained asbestos fibers and needles. Blount, A M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs." *Environmental Health Perspectives* 94 (August 1991): 225–30; *see also* 4/13/2018 Deposition of Alice Blount 30:16-33:8, 47:15-25.

87.     On November 14, 2018, Drs. William Longo and Mark Rigler published a report detailing results from tests they performed on samples of J&J talc PRODUCTS provided by the J&J Defendants dating from the 1960s to the early 2000s. 68% of the samples tested contained amphibole asbestos. The authors further found that 98% of the samples contained fibrous talc. In

2019, the U.S. Food and Drug Administration ("FDA") contracted AMA Analytical Services, Inc. to test samples of talc-containing cosmetics, including Johnson's Baby Powder. AMA identified chrysotile asbestos and talc fibers in a sample of Johnson's Baby Powder. As a result, Johnson & Johnson Consumer Inc. issued a recall of all bottles (approximately 33,000) from the sampled lot.

### C.   EVIDENCE OF ASBESTOS IN DEFENDANTS' PRODUCTS

88.   Beginning at least in the 1950s, J&J tested its talc for contaminant or co-minerals, including "asbestos" and "tremolite," because the company knew they are deleterious minerals that could be harmful to a person's health and thus should not be found in talc-based cosmetic products.

89.   At all times relevant hereto, J&J and Defendants understood the dangers posed by asbestos exposure and that asbestos was a known contaminant of talc used in cosmetic and industrial products.

90.   All information known to J&J concerning the hazards of asbestos-containing talc was shared with and known by the Defendants.

91.   Internally, J&J historically defined "asbestos" as "the fibrous serpentine chrysotile and the fibrous forms of … anthophyllite, … tremolite, and actinolite." *See* 4/16/2018 Deposition of John Hopkins 174:24-175:23.

92.   In addition to conducting its own internal tests described above, J&J hired testing laboratories, such as the Battelle Memorial Institute, McCrone Associates, the Colorado School of Mines Research Institute, and others to test for asbestos contamination (or co-mineralization) in the source talc ore used to manufacture Johnson's Baby Powder and J&J cosmetic products. [1]

---

[1] *See, e.g.*, 4/12/1960 Battelle Memorial Institute report; 10/15/1957 Battelle Memorial Institute report; 5/23/1958 Battelle Memorial Institute report; 7/31/1959 Battelle Memorial Institute report; 8/31/1959 Battelle Memorial Institute report; 9/15/1959 Battelle Memorial Institute report; 12/31/1959 Battelle Memorial Institute report; 1/24/1968 Battelle Memorial Institute report; 5/9/1958 Battelle Memorial Institute report; 3/8/1960 Battelle Memorial Institute report;

93.     All of these testing laboratories found asbestos minerals both in the source talc ore and J&J's cosmetic talc products.[2]

94.     Testing done by J&J, Defendants, and their consultants in the 1960s, 1970s, 1980s, and 1990s demonstrated that there was asbestos in the talc mined from J&J's Vermont mines.

95.     Contaminants satisfying J&J's and Defendants' own definition of asbestos have been found in J&J talc, include "chrysotile," "tremolite," "anthophyllite," and/or "actinolite." *See, e.g.*, 12/4/1970 Colorado School of Mines Institute testing results; 6/30/1971 Colorado School of Mines Institute testing results; *Barden* Trial Ex. P3695-082-86: Summary chart of testing of Johnson's Baby Powder detecting asbestos and asbestos minerals.

96.     The existence of laboratory tests finding asbestos in J&J's cosmetic talc products and source talc used in those products was verified by J&J under cross examination in recent litigation. *See* Trial Testimony of John Hopkins from *Barden et al v. J&J*, 8/14/19 at 148:17-21.

97.     As detailed in the following paragraphs, J&J executives acknowledged and communicated internally amongst themselves and with Defendants about the results of testing demonstrating the presence of asbestos in J&J's consumer talc products and the source ore used to make these products.

98.     In 1972 for example, J&J's Al Goudie confirmed that McCrone found trace tremolite and that these findings are "not new." *See* handwritten note from W. Nashed to Dr.

---

6/6/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton summarizing observations of Smith Gouverneur, NY and Hammondsville, VT ore deposits, beneficiation products; 8/25/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton evaluating exploration work on Hammondsville talc deposit.

[2] *See, e.g.* 4/14/1971, Colorado School of Mines Institute letter to Johnson & Johnson; 10/27/1972, McCrone report; 2/26/1973, Colorado School of Mines Institute to W. Ashton of Johnson & Johnson re: Mineralogical Exam of Five Talc Samples; 6/6/1973, Johnson & Johnson memorandum; 2/11/1974, McCrone to JJ Rolle; 4/10/1974, McCrone to JJ Russell; 4/24/1974, McCrone report; 4/27/1973, Microscopic Exam of Johnson's Baby Powder; 5/8/1974, McCrone report; 7/8/1974, McCrone to J.J. Rolle; 10/10/1974, McCrone to Windsor Minerals Inc.; 12/9/1974, McCrone to Johnson & Johnson; 7/1/1975, McCrone to Windsor Minerals Inc.; 8/31/1976, Johnson & Johnson Memo Re: Vermont 66 Talc; 9/11/1975, Stewart to V. Zeitz; 11/5/1975, McCrone to Windsor Minerals

Goudie.

99.     In May 1973, Roger Miller, the President of J&J's mining company, Windsor Minerals, informed Dr. Dewitt Petterson of J&J that "the ore body contains actinolite." *See* 5/1/1973 Memo from R.N. Miller to Dr. Petterson. This talc ore body was actively used to produce J&J's cosmetic talc products.

100.    One week later, J&J's William Ashton informed Dr. Petterson that "[t]he first showing of actinolite we know about is October 1972." *See* 5/8/1973 Memo from W. Ashton to D. Petterson.

101.    In April 1969, J&J discussed the need to firm up the company's position on tremolite in talc because of potential dangers to human health and safety noted in the medical literature and by environmental health agencies. *See* 4/9/1969 Ashton to Hildick Smith - Alternate Domestic Talc Sources File No. 101.

102.    J&J was concerned that the presence of tremolite in its cosmetic talc products, and thus, the resultant inhalation of talc with these needle-like crystalline structures, was related to the rising incidence of pulmonary diseases and cancer and increased the risk that the company would be drawn into litigation relating to these diseases and cancer. *See* 4/15/1969 Thompson to Ashton-Alternate Domestic Talc Sources File No. 101.

103.    In July 1971, J&J reported a conversation with Dr. Clark Cooper, a professor at the School of Public Health at the University of California, Berkley, who expressed his concern that there is no place for asbestos in talc and any talc with asbestos should be removed from the market. *See* 7/30/1971 Hildick Smith to R.A. Fuller. According to Dr. Cooper, no level of asbestos in talc is acceptable for cosmetic use. *Id.*

104.    J&J was aware of studies demonstrating that both talc and asbestos have been found

in the tissue of women who never worked with asbestos or talc. *See* 2/19/2019 Deposition of Susan Nicholson 83:6-11.

105.    J&J and the Defendants have known for many years that the talc used in Johnson's Baby Powder could be inhaled and reach deep into the lung.

106.    For decades, J&J and the Defendants (and their predecessors) have known about the dangers of talc powder inhalation during the normal and expected use of its talc-based cosmetic products, especially to babies. *Id*. at 111:2-112:15; *see also id.* at 116:11-119:18 and 5/27/2009 email from Nancy Musco.[3]

## D.    DEFENDANTS' ACTIONS IN RESPONSE TO THE EVIDENCE OF CANCER RISK

107.    In response to these inquires, J&J has always assured consumers that asbestos has never been found in Johnson's Baby Powder and that it never will. Historically, when pressed, J&J always responded that there is no evidence that Johnson's Baby Powder contained any amount of asbestos and there never was.

108.    J&J repeatedly told consumers and the public that "Baby Powder does not contain asbestos and never will. We test every single lot to ensure it." 12/19/2018 Johnson & Johnson Ad.

109.    Johnson's Baby Powder product label says it was the "Purest Protection," and it was advertised as "the best you can buy" and "the purest." P3695-265.

110.    The intent of these representations to consumers has always been "to reassure them

---

[3] *See* 11/10/1971, Letter from A.M. Langer to G. Hildick-Smith; 8/24/1972, Memo from W. Nashed to R.A. Fuller; 9/25/1972, Memo from W. Nashed to Fuller, Hildick-Smith, on Shower-to-Shower/Asbestos FDA Meeting 9/21/1972; 6/12/1972, ES Laboratories Talc Analysis (Asbestos); 12/13/1973, Memo from M.J.M. Oerlemans to J.H. Smids, H.L. Farlow, Re: Asbestos in Baby Powder; 9/9/1975, Memo from G. Lee Re: A.M. Langer Analysis of Talcum Powder Products – Edinburgh Meeting; 4/23/1998, Letter from A.M. Blount to R. Hatcher; Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc; University of Minnesota Investigation of Possible Asbestos Contaminations in Talc Samples.

they could feel safe and comfortable using Johnson's Baby Powder because it does not contain asbestos" and to convey that in using Johnson's Baby Powder, there was "zero chance" of exposing their families to asbestos. 2/15/2019 Deposition of Nancy Musco 39:7-42:8.

111.    The statements made to consumers by J&J, including that Johnson's Baby Powder does not contain asbestos and that there was "zero chance" consumers were exposing their families to asbestos, were false when they were made, and J&J knew they were false when they made those statements.

112.    As a direct result of J&J's false representations that Johnson's Baby Powder never contained asbestos, millions of people, including babies, were unwittingly and needlessly exposed to asbestos.

113.    J&J has never communicated to the public or federal government that it knew that its asbestos-containing talc-based cosmetic products would be aerosolized and inhaled during normal use.

114.    J&J has never placed warnings on its talc-based powder products about the potential hazards presented by the product being aerosolized in normal application.

115.    J&J never placed warnings on its talc-based powder products about the risk of asbestos exposure.

116.    J&J purposely withheld from their spokespeople, whose job it was to communicate the "no evidence of asbestos" message, any reports indicating there was in fact evidence of asbestos in Johnson's Baby Powder.

117.    In 1973, Cosmetic Toiletry and Fragrance Association ("CTFA"), now known as Personal Care Products Council ("PCPC"), the trade association utilized by the Defendants to protect their interests, created a talc subcommittee and the Scientific Advisory Committee to

develop a testing methodology for detecting asbestos in talc. Initially, PCPC designated a group of its members to test talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy but rather TEM and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Defendants then owning or having unfettered access to same.

118.    Going forward, the difference between what Defendants knew diverged from what they were representing to the FDA. Defendants and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the adopted and most economical analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc nor detect tremolite asbestos contamination levels below 2-5%.

119.    Defendants and third parties collectively met with and corresponded with PCPC and also met with the FDA to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by Defendants and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection

limit of XRD. Defendants knew that the XRD detection limits were inadequate. Defendants also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Plaintiff was exposed.

120.     In support of their voluntary XRD methodology, which was finally published in 1977, PCPC produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. PCPC, Defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens. Defendants made and published representations claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff, that talc-containing products contained asbestos.

121.     The Defendants have represented to various news media outlets and the public at large that their products are "asbestos-free" when, in fact, their products did test positive for asbestos, and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" means something much different than "no asbestos," but due to Defendants' repeated conflation of the terms, the public has been led to erroneously believe talc products are safe.

122.     Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos as

well as other constituents such as fibrous talc, cadmium, cobalt, chromium, copper, iron, manganese, and nickel. None of these positive tests were ever produced or made known to any regulatory agency until late 2019, and only after knowledge of their existence became known in civil litigation.

123.    Since at least 1979, Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are, therefore, safe. Nothing could be further from the truth: the FDA has never been granted the regulatory authority by Congress to regulate cosmetics, including talcum powders.

124.    Defendants, collectively by their agreement and conspiracy, controlled industry standards regarding the testing, manufacture, sale, distribution, and use of talcum powder products, and Defendants controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to carcinogens, including talc, asbestos, and fibrous talc. Defendants knowingly and intentionally released, published, and disseminated invalid, inaccurate, outdated, and misleading scientific data, literature containing misinformation, and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which Plaintiff was exposed.

125.    Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in the data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiff, of alarming medical and scientific findings surrounding the safety of asbestos-containing talc and talcum powder products, many of which remained in their exclusive possession and under their exclusive control.

126.    Defendants conspired and/or acted in concert with each other and/or with other

entities through agreement and consciously parallel behavior: (a) to withhold from users of their products—and from persons who Defendants knew and should have known would be exposed thereto—information regarding the health risks of asbestos, talc, and other carcinogens contained in the PRODUCTS; (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos, talc and other carcinogens in the PRODUCTS; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos, talc and other carcinogens therein; and (d) to falsely represent that talc and talcum powder products, including those of Defendants, were safe for use by consumers.

127.    McCrone Associates, the laboratory selected by several talc producers—including Defendants—to analyze their products, was already using TEM for asbestos analysis. An article by McCrone and Stewart from 1974 describes the advantages of TEM for asbestos analysis and states that TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

128.    The PCPC "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published J4-1 method did not rely on TEM, but on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." PCPC met with and corresponded with Defendants and third parties to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by tests by TEM when XRD was positive or suspicious.

129.    This voluntary testing method was developed by PCPC and Defendants and was

advocated to the FDA by PCPC and Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though PCPC and Defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "PCPC Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite.

130.    In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using PCPC's own J4-1 method. There is no evidence that the Defendants ever shared this remarkable failure with the FDA or the public.

131.    The FDA, and ultimately Plaintiff, directly and/or indirectly relied upon PCPC's false representations regarding the safety of cosmetic talc. In fact, an FDA letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding PCPC's and Defendants' misrepresentations and concealment was obvious seven years later. In a response to a July 11, 1986, Citizen Petition requesting an asbestos warning label on cosmetic talc, the FDA stated that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" PCPC's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc.

132.    In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, three decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

133.    On or about September 17, 1997, J&J's own toxicology consultant, Dr. Alfred Wehner, informed the company about false public statements being made by it regarding talc

safety. P-20 (JNJ000040596).

134.    In response to safety issues related to talc and talc-based body powders, the CTFA

formed the Talc Interested Party Task Force (TIPTF). The TIPTF, which was originally formed in

anticipation of litigation related safety issues, periodically convened, including in the 1970s and

1980s, to defend talc in response to safety concerns about talc. The TIPTF once again convened

in and around 1992 to combat the United States National Toxicology Program's study. Defendant

J&J was one of the primary actors and contributors to the TIPTF. P-14 (JNJ000011704); P-83

(LUZ011963); 02/18/2016 Deposition of Mark Pollak Exhibit No. 2 Spreadsheet: Talc IP –

Revenue Received; Date Initiated: 08/17/92.

135.    The stated purpose of the TIPTF was to pool financial resources of these companies

in an effort to collectively defend the use of talc and, specifically, talc-based body powders at all

costs, in anticipation of future litigation, to ensure self-regulation, and to prevent local, state, or

federal regulation of any type over this industry. J&J wielded considerable influence on TIPTF.

TIPTF hired scientists to perform biased research regarding the safety of talc. Members of TIPTF,

including J&J, edited reports of the scientists hired by this group before they were submitted to

governmental agencies and/or released to the consuming public. Members of TIPTF knowingly

released false information about the safety of talc to the consuming public and used political and

economic influence on local, state, and federal regulatory bodies regarding talc. These activities

were conducted by these companies and organizations, including J&J, over the past four (4)

decades in an effort to prevent regulation of talc and to create confusion to the consuming public

about the true hazards of talc relative to cancer. *See* P-14 (JNJ000011704); P-13

(JNJTALC000249618);   P-122   (JNJ000021035);   P-66   (IMERYS-A_0006056);   P-20

(JNJ000040596); P-27 (JNJ000000636); P-24 (JNJTALC000716846); JNJTALC000224218.

136.    At all times relevant, in anticipation of litigation and regulatory action, PCPC coordinated the defense of talc and talc-based body powder and acted as a mouthpiece for the members of the TIPTF, including J&J. PCPC, completely reliant on funding from cosmetic-industry companies, was motivated to defend talc and talc-based body powders to retain its members involved with these products and retain their revenues. Upon information and belief, and at all times relevant, PCPC's revenue has been predominantly generated through a dues system based in part on its members' annual sales. In addition, PCPC's salaries are nearly equivalent to the membership dues received, creating a direct pecuniary interest in defending the safety of talc, talc-based body powders and the PRODUCTS.

137.    In and around the mid-1970s, the Cosmetic Ingredient Review ("CIR") was formed to give PCPC and the cosmetic industry more credibility for self-regulation. Since that time, CIR has reviewed the safety of ingredients used in the cosmetic and personal care products industry. Although Defendants have, at all relevant times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC, and its employees are paid by PCPC.

138.    Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1,800 ingredients to be "safe as used." Additionally, the CIR Expert Panel annually holds two-day quarterly meetings to review substances. Over the course of these annual meetings, the panel is able to review about 500 ingredients per year. On average, only about 20 minutes are spent discussing the safety of each ingredient.

139.    Even though PCPC knew of the safety concerns surrounding talc and talc-based body powders for almost three decades, the CIR did not begin to review talc until after the first

lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process, Defendants, including PCPC, influenced the CIR scientists writing and performing the review and, ultimately, edited the reviews in a biased manner. Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

140.    In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc-based body powders, and the PRODUCTS to the public and used influence over federal, state, and local governmental and regulatory bodies regarding talc and talc-based body powder. *See* P-20 (JNJ000040596); P-10 (JNJ000021093).

141.    Defendants engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Plaintiff, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling talcum powder products which contained asbestos and fibrous talc, which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Plaintiff.

142.    Defendants have long employed and/or consulted with doctors, scientists, geologists, mineralogists, and toxicologists, and they have maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of asbestos and asbestiform talc fibers in talc and talc deposits. Despite the wealth of knowledge, Defendants continued to mine, mill, process, supply, distribute, design, manufacture, and sell talcum powder products which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Plaintiff.

E.    **DEFENDANTS MISREPRESENTED OR CONCEALED INFORMATION ABOUT ASBESTOS IN THE PRODUCTS FROM THE GOVERNMENT AND THE PUBLIC**

143.    Since the early 1970s, the FDA has repeatedly asked J&J whether it's talc-based

products contained asbestos (2/19/2019 Deposition of Susan Nicholson 87:10-23) including, whether there was any evidence of any amount of asbestos in any J&J's cosmetic talc product. *Id.* at 88:20-24.

144.     J&J's answer to the FDA's inquiries was always the same: there is no evidence of any amount of asbestos in any J&J cosmetic talc product. *Id.* at 89:3-8.

145.     While J&J's CEO has recently proclaimed that "we have always cooperated fully and openly with the FDA and other regulators and have given them full access to our talc testing results" the record is to the contrary. *See* 12/19/2018 Johnson & Johnson Ad); *see also* Alex Gorsky Video (J&J claims that it "has cooperated fully with the U.S. FDA and other global regulators providing them with all the information they requested over decades.").

146.     In the early 1970s, independent scientists publicly reported finding asbestos in J&J talc products. *See* 11/10/1971 Letter from A.M. Langer to G. Hildick-Smith; 9/9/1975 Memo from

G. Lee Re: A.M. Langer Analysis of Talcum Powder Products – Edinburgh Meeting; Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc.

147.     In response, J&J sought to discredit the independent scientists' results and hired consultants to refute the asbestos in talc findings. Some of J&J's experts found asbestos when evaluating consumer talc products. These results were reported to J&J, though the company never provided those results to the FDA. J&J's claim that it provided the FDA with its "entire background file on asbestos talc testing" related to the company's cosmetic talc products was untrue because it never provided the FDA with the test results it received that identified asbestos in its talc and cosmetic talc products. *See* 2/19/2019 Deposition of Susan Nicholson.

148.     J&J did not tell the FDA that it possessed test results finding asbestos in the mine ore and the finished talc product, nor did it give those results to the FDA. *See id.* at 105:2-5.

149.    Under cross-examination, J&J's representative was forced to admit that despite claiming that it provided all testing to the FDA, J&J never provided any results of asbestos testing of its talc products or ore to the FDA for the Vermont mine after 1973. 3/6/2019 Deposition of Susan Nicholson 293:12-294:19. These include tests in which fibers matching the J&J definition of asbestos were found. *Id.* at 349:6-353:23.

150.    Since the early 1970s, J&J represented to the FDA that there was no tremolite or fibrous talc in its talc-based cosmetic products. 2/19/2019 Deposition of Susan Nicholson 89:17–90:8; *see also* 7/21/1971 J&J Memo to File: Special Talc Project No. 503 FDA Meeting.

151.    Over the course of more than 4 decades, J&J represented to the FDA "over and over again" that there is not a single instance or report of asbestos – including chrysotile asbestos – in its products. 2/19/2019 Deposition of Susan Nicholson 98:10-19.

152.    Beginning in early 1970s, J&J represented to the FDA that its data "conclusively proves that Johnson's Baby Powder is free of asbestos." *Id.* at 90:9-23; *see also* 9/21/1971 Letter from W. Nashed to FDA Director R. Schaffner ("It is seen that the data conclusively proves that Johnson's Baby Powder is free of asbestos.").

153.    J&J has represented to the FDA that "no amphibole materials have been detected" in the company's talc-based products. 2/19/2019 Deposition of Susan Nicholson 99:2-21; *see also* Exhibit 132 (3/15/1976 Letter from G. Lee re: Examination of Asbestos in Talc at 6).

154.    When pressed, J&J went so far as to represent to the FDA that "there wasn't a shred of evidence to support the idea that either our Johnson's Baby Powder or Shower to Shower contained any chrysotile asbestos." 12/13/1972 J&J Memo re: Meeting Nov. 1, 1972 with Dr. Schaffner – FDA); *see also* 2/19/2019 Deposition of Susan Nicholson 90:24-91:18.

155.    J&J knew that its standby consultant McCrone purposely omitted findings of

asbestos in its talc-based products because it "would only tend to confuse the issue perhaps with the FDA" and offered that if J&J "decide[d] to use these reports with the FDA" to "please call us." 10/12/1971 Letter from G. Grieger to A. Goudie; *see also* 3/6/2019 Deposition of Susan Nicholson 327:14-328:21.

156.    As a part of its testing and reporting protocol for J&J's talc-based products, McCrone would segregate any test results that were positive for the presence of asbestos in talc ore or cosmetic talc products from those that allegedly found "no quantifiable" asbestos. For instance, on April 29, 1986, under McCrone Project No. ME-2275 and Purchase Order WS-0503, McCrone authored two separate reports of test results for Windsor Minerals. The first was for 11 talc samples in which "no quantifiable" amounts of asbestiform were found. The second was for the three talc samples (noticeably extracted from the numbering sequence) in which traces of chrysotile were found. *Compare* Deposition of Nancy Musco Ex. 8B, Tab 73 *with* 4/29/1986 Edley Samples.

157.    As further explained in the paragraphs below, McCrone and J&J worked together to manipulate the asbestos testing results of J&J products done by outside laboratories and reported those manipulated findings to the FDA as negative results.

158.    Although aware of McCrone reports to the contrary, J&J represented to the FDA that its consultant McCrone Associates never found asbestos in the talc ore that was used to make the PRODUCTS. 3/6/2019 Deposition of Susan Nicholson 316:8-23; *see also id.* at 326:20–327:2 (J&J cites McCrone tests to the FDA to support its position that there was "no evidence" of asbestos in the Shower to Shower product). This statement to the FDA was false.

159.    In 1972, after J&J was notified that an FDA consultant found asbestos in the J&J talc products, J&J hired Professor Hutchinson from the Minnesota Space Center to privately test

the products with the intention of refuting the FDA consultant's findings.

160.    On September 20, 1972, in anticipation of a meeting with the FDA to discuss the asbestos test results, J&J executives arranged for its consultant, Ian Stewart of McCrone, to meet with Professor Hutchinson in the Chicago O'Hare airport. At that meeting, Professor Hutchinson informed Ian Stewart that he found "incontrovertible asbestos" in J&J's talc-based products (handwritten notes by Professor Hutchinson). From there Mr. Stewart, on behalf of J&J, flew directly to Washington DC to meet with the FDA to discuss test results. Mr. Stewart never disclosed Dr. Hutchinson's findings of asbestos to the FDA. *See* Ian Stewart Traveling Expense report.

161.    Thereafter, Professor Hutchinson provided J&J with a formal report documenting his asbestos findings with photographs of the asbestos he found in the J&J products. J&J produced excerpts of the report to the FDA, removing all references to Professor Hutchinson's "incontrovertible" findings of chrysotile asbestos. 3/6/2019 Deposition of Susan Nicholson 339:20-341:9, 345:11-21.

162.    J&J similarly never informed the FDA that it was aware of additional evidence demonstrating the presence of actinolite in Johnson's Baby Powder. *Id.* at 325:4-15. For example, J&J did not submit a March 1974 test result from Professor Reynolds at Dartmouth College that "Actinolite is the dominant fiberform amphibole in the ore and talc product provided by Windsor Minerals." *Id.* at 346:24-347:2; *see also* JNJ 000266903 (3/1974 Memo re: Analysis of Talc Products and Ores for Asbestiform Amphiboles).

163.    Instead, J&J submitted test results to the FDA from Dartmouth claiming that no amphiboles were found in the company's talc products. *See* 2/19/2019 Deposition of Susan Nicholson 158:10-159:1.

164.     As part of its plan to mislead the FDA and falsely claim its talc ore and cosmetic talc products were free of any asbestos, J&J hired outside consultants to conduct tests of J&J talc products using test methods that J&J knew would not detect asbestos at low levels. 2/19/2019 Deposition of Susan Nicholson 196:19–24, 197:24-198:8.

165.     Thereafter, J&J submitted test reports to the FDA as proof that its talc was asbestos free knowing that the methods used would not detect asbestos at low levels and, thus, were not reliable to rule out the presence of asbestos. *See* 3/6/19 Deposition of Susan Nichols 255:23-256:4.

166.     Instead of utilizing a method it knew was sensitive enough to find asbestos at low levels, J&J routinely used a testing method that was not sufficient to detect asbestos at those level and continued to submit the same false negative testing results to the FDA. This method was known as J4-1.

167.     The J4-1 testing method utilized "XRD" as the initial screen to determine if any further testing was necessary (with a level of detection of about 1%). Exhibit 139 (CTFA Method J4-1 Part I & Part II). If the XRD test result was negative, no more testing would occur, and the sample would be reported as "none detected." This process virtually guaranteed that low levels of asbestos would never be found.

168.     J&J similarly knew that XRD could not detect chrysotile at levels below two or three percent of the talc product and was also incapable of detecting low levels of tremolite. 2/19/2019 Deposition of Susan Nichols 196:19-198:8.

169.     In the unlikely event an XRD test result was positive, J&J implemented a second step, polarized light microscopy ("PLM") but instructed the PLM analyst not to count all of the fibers he or she would actually see under the microscope. CTFA Method J4-1 Part I & Part II. Short fibers, below a defined size, recognized as carcinogenic, were excluded from any reporting.

According to the J4-1 method, a fiber must have an aspect ratio (length to width) of 5:1 or greater, and both dispersion testing and fibrous morphology criteria must be satisfied before a particle can be identified as asbestiform. *See id.*; JNJNL61_000005032 (5/21/1995, Johnson & Johnson TM7024 TEM Analysis of Talc for Asbestiform Minerals).

170.　J&J knew and was advised of other methods of testing talc that were sensitive enough to detect the presence of small fibers of asbestos in its talc ore and/or cosmetic talc products and, thus, provide more accurate results than the testing it purposely utilized to increase the likelihood of negative results. One of those methods was the "pre-concentration" method. JNJ 000268037 (12/27/1973 Colorado School of Mines Research Institute report); JNJAZ55_000005081 (6/6/1973 Memo to Pooley from Rolle); JNJ000266903 (3/1974 Memo from R.C. Reynolds, Jr. to Windsor Minerals, Inc.) ("a concentration technique is mandatory because it brings the amphiboles into a reasonable concentration range for optical or other methods of analysis."); JNJNL61_000007330 (Special Talc Studies Monthly Report, March, 1974 – Assay Methods for Asbestos Minerals in Talc); JNJ 000250919 (3/11/1974 Memo from J.P. Schelz to F.R. Rolle); Exhibit 144, JNJNL61_000062964 (11/26/1974 Memo from J.P. Schelz to F.R. Rolle) (collectively referred to as "concentration method").

171.　Internal J&J memoranda prove the company considered "the limitation" of the concentration method "is that it may be too sensitive" and when used found traces of tremolite which the J&J testing methods would fail to expose. JNJAZ55_00001892 (5/16/1973 Memo from F.R. Rolle to T.H. Shelley).

172.　When J&J consultant, Dr. Fred Pooley, told J&J that the concentration method was being used in Great Britain, the method was rejected by J&J as not "in the worldwide company interest." JNJNL61_000062953 (2/18/1975 Johnson & Johnson Limited letter to Johnson &

Johnson).

173.     Although many of J&J's consultants—including the Colorado Research School of Mines, Professor Pooley of Cardiff University, Professor Reynolds of Dartmouth College, and Professor Alice Blount of Rutgers University—found asbestos in J&J's talc-based cosmetic products using the pre-concentration method, the company did not provide any of those test results to the FDA. 2/19/2019 Deposition of Susan Nicholson 172:8-15.

174.     J&J was also urged by its consultants to use TEM to test for asbestos as it was far more sensitive than the J4-1 method used by J&J. *See, e.g.,* JNJNL61_000006726 (5/18/1973 Message on from G.E. Heinze to W. Ashton et al. – Talc Symposium); JNJ 000035507 (9/30/1992 Notes on Meeting with Professor F. Pooley, Cardiff) ("TEM is the only suitable method for looking for fibers of biologically relevant dimensions in lungs, therefore it is logical to use the same technique for examining mineral products for biologically relevant fibers."); Johnson & Johnson correspondence at FDA_FOIA_013573 ("I think we all recognize XRD, PCM, and PLM are simply not sensitive enough to provide complete assurance that the talc is free of detectable asbestos.").

175.     Eventually, J&J began to use TEM as a testing method on a limited basis but implemented a TEM reporting methodology designed to yield negative, rather than accurate results. In this regard, J&J intentionally limited the amount of each sample that was analyzed and required a high fiber count of the same mineral type before a positive result could be reported. J&J called its method TM7024.

176.     According to J&J's TM7024 method, J&J would report the test results as negative and "not quantifiable" unless the scientist, who was directed to look only at approximately 10 percent of the material available to examine under the microscope, counted 5 or more asbestos

fibers of the same variety. JNJNL_000005032 (5/21/1995, Johnson & Johnson TM7024 TEM Analysis of Talc for Asbestiform Minerals). Thus, even if the examiner counted as many as 16 asbestos fibers (i.e., four fibers each of tremolite, actinolite, anthophyllite, and chrysotile) looking only at 10 % of the sample seen under the microscope, it would be reported as not finding asbestos or "not quantifiable."

177.    J&J's position about the scientific propriety of its TM7024 testing protocol was and remains inconsistent with that of environmental and health agencies. The United States Environmental Protection Agency ("EPA") has refused to limit its concern to only the type of identifiable asbestos fibers J&J instructs its microscopists to count. 4/20/2006 US EPA Region IX Response to the November 2005 R.J. Lee Group, Inc.

178.    To further reduce the likelihood of detecting asbestos in its cosmetic talc ore, J&J required J4-1 method testing on only a composite from every two silos of talc (each silo containing hundreds of tons of talc), TM7024 testing only quarterly from a composite of all siloed talc, and a monthly composite of float feed. JNJMX68_000002913 (10/4/1984 Memo from J.A. Molnar to B. Semple, on Evaluation Program for Talc). As a result, the total amount of talcum powder J&J ever put under a microscope to test for asbestos was approximately 1/100 of a breath mint by weight. 1/29/2020 Testimony of Matthew Sanchez 134:19-135:20. Even though J&J tested miniscule amounts of product and utilized methods specifically designed to yield negative results, asbestos was still found in J&J's cosmetic talc. *See* chart of various testing results. Upon information and belief, J&J did not produce these asbestos- positive test results to the public until 2017.

179.    In 1976, J&J rejected the FDA's request to provide the results of its respective periodic monitoring for asbestos. *See* 3/6/19 Deposition of Susan Nicholson 255:17-256:6.

180.    J&J also submitted false and misleading statements through its trade association

(CTFA).

181.    In March of 1976, the CTFA told the FDA that all industry testing had shown all talcum powder products to be completely free of asbestos. *See* JNJ000330157.

182.    On March 15, 1976, George Lee, Director of Applied Research for Johnson & Johnson, wrote to the CTFA, with the "understanding that you would wish to submit this information to the FDA," that it was "erroneously reported in 1971 that our powder contained asbestos," that the Vermont talc is "highly purified," and that J&J confirms the "absence of asbestos materials in this talc." WCD000009. This false information was then transmitted by the CTFA to the FDA to "give assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products." JNJ000330157.

183.    Two weeks later, on March 31, 1976, J&J met privately in Hillside, New Jersey. During this meeting, Defendants congratulated themselves on the "success" of the "presentations" to the FDA and agreed that they should not bind themselves to having to further update the FDA. JNJ000299024.

184.    On March 1, 1978, John Schelz, the Chairman of the CTFA Task Force on Round Robin Testing and then current employee of J&J, instructed the CTFA to "destroy your copy of the table" containing the results of the CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals. JNJNL_000062534 (3/1/1978 correspondence from Johnson & Johnson to the CTFA).

185.    Decades after asbestos was first reported, J&J continued to represent to the FDA that it had confirmed "the absence of asbestiform minerals" in its finished talc-based products. JNJ 000021285 (6/27/1995 Comments of CTFA in Response to a Citizens Petition at 7-8).

186.    As recent as 2016, J&J represented to the FDA that no asbestos structures have ever

been found in its talc-based products in any testing anywhere in the world. 2/19/2019 Deposition of Susan Nicholson 99:18-100:9; *see also* JNJ 000489313 (3/17/2016 J&J Response to FDA Request for Information on Talc at 12). This statement made to the FDA was false.

187.    In about 2013, while editing information for its website, J&J even acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free" but made the representations anyhow. Draft 1–Copy for SafetyandCareCommitment Website.

## F.    JOHNSON & JOHNSON DESTROYED OR SECRETED AWAY RELEVANT EVIDENCE

188.    J&J has had the duty to preserve evidence and documents relevant to foreseeable litigation, including the responsibility to suspend any document destruction policies beginning 1969, and certainly no later than 1971.

189.    Since at least 1969, J&J was aware that it was foreseeable and likely that it would be sued in personal injury litigation alleging pulmonary injuries–including asbestos-related disease–attributable to J&J's talc-based products.

190.    On April 15, 1969, Dr. T.M. Thompson, Medical Director for J&J, wrote to Mr. William H. Ashton, a J&J executive supervising the company's talc-based products, to advise him of danger relative to "inhalation" of the "spicule" or "needle-like" crystals of tremolite in J&J's talc. *See* JNJ000087991 (4/15/1969 Letter from T. Thompson to W. Ashton Re: Alternate Domestic Talc Sources) ("[S]ince pulmonary diseases, including inflammatory, fibroplastic and neoplastic types, appear to be on the increase, it would seem prudent to limit any possible content of tremolite in our powder formulations to an absolute minimum.").

191.    Although Dr. Thompson states that he was not aware of "any litigation involving either skin or lung penetration by our talc formulations," he cautioned Mr. Ashton that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it

is not inconceivable that [Johnson & Johnson] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." *Id.* To that end, Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." *Id.*; *see also* 2/15/2019 Deposition of Nancy Musco 64:18–68:1.

192.    Dr. Thompson further forewarned Mr. Ashton that the company could confront a situation where the company would be more or less compelled to remove its talc products "if it became known that our talc formulations contained any significant amount of Tremolite." JNJ000087991 (4/15/1969 Letter from T. Thompson to W. Ashton Re: Alternate Domestic Talc Sources).

193.    Dr. Thompson's prediction of litigation came to fruition shortly thereafter. By the early 1970s, J&J was involved in litigating and planning its defense to personal injury cases related to its talc products.

194.    Through the litigation process, J&J has been forced to identify documents from as early as 1971 (and from every year thereafter) relating to "ongoing," "pending," and "anticipated" litigation regarding Johnson's Baby Powder. 2/15/2019 Deposition of Nancy Musco 74:23-76:7, 93:3-16.

195.    Since at least 1971, J&J has known and recognized that information and documentation in the company's possession relevant to or produced in any particular talc-based lawsuit would be relevant to discovery in future talc-based cases. *See id.* at 25:13-20.

196.    J&J has reported that during the 1970s alone, the company was sued in talc-based cases in nearly every year of the decade. *See id.* at 81:25-82:12. Although J&J was legally obligated to retain the evidence, it does not know where the documents and evidence related to

these cases are located or whether they even exist. *See id.* at 78:25-79:23, 80:6-81:24.

197.     While the evidence from the cases is missing, documents listed on J&J's privilege log related to these cases date back to 1971 and every year thereafter. *See id.* at 93:3-16. The cases described on the log indicate the records from which were spoliated and no longer exist include litigation involving both industrial talc and Johnson's Baby Powder. *See id.* at 93:17-94:16.

198.     The destruction or secreting of evidence began at least as early as the 1970s. In 1977, for example, the Talc Task Force conducted "round robin" testing of talcum powder products manufactured by member companies.

199.      John P. Schelz, a J&J employee and chair of the Talc Task Force, coordinated the testing and review of the testing data. *See* JNJ 000250596.

200.     Once the testing data was received, Schelz compiled the data in a table and assigned each sample a coded value. He then created a separate "code key" to interpret the coded value assigned to each sample.

201.     He did not send the code key to any of the other companies. *See* JNJ 000265120.

202.     Schelz sent the only other copy of the code key to Charles Haynes at PCPC with instructions to destroy the code key after Haynes called the companies to inform them of the results. *See id.*

203.     Upon information and belief, both Schelz and Haynes destroyed the code keys to the "round robin" testing results. As a result, it's impossible to determine which products were tested. *See id.*

204.     Although all companies involved in the "round robin" testing agreed to the process of destroying the code key, J&J and PCP orchestrated the scheme.  As recounted by PCPC's Vice President Dr. Norman E. Estrin, "a J&J official" (presumably Mr. Schelz), purchased samples of

talc at retail.  The J&J official then coded the samples and sent them to testing laboratories.  He received the results of the analyses and prepared a table using code numbers.  The J&J official then contacted each of the participating companies by telephone only to inform them of the results of their product only.  After all companies were notified, the J&J official destroyed the code key with PCPC's knowledge and consent.  *See* JNJ 000325952.

205.    All companies involved in the "round robin" testing agreed to the process of destroying the code key.

206.    The information contained in files of cases involving injuries sustained from J&J's industrial talc is highly relevant to this case as it was the same used in JBP. *See* Affidavit of Roger Miller, *Edley v. Windsor Minerals, Inc.*, No. MID-L-075913-86 (N.J. Super. Ct. Middlesex County).

207.    According to J&J's own records prior to 2000, there were personal injury cases involving Johnson's Baby Powder filed and pending with future cases anticipated.

208.    Although J&J, by its own admission, had an obligation to preserve evidence once litigation concerning the health effects of its talc products was foreseeable, it failed to do so. *See* Deposition of Nancy Musco 278:24-280:23. J&J knew and understood that evidence adduced in litigation concerning the health effects of its talc products would be material and relevant to other anticipated cases. *See id.* Yet J&J failed to preserve records from any of the lawsuits that alleged injuries as a result of Johnson's Baby Powder, talc, or asbestos, even though J&J knew that relevant and material documents existed and were in its possession.

209.    While J&J internally recognized there could be dire consequences for failing to preserve evidence, there is no record of a litigation hold ever being imposed prior to 1997. Even then, J&J's General Counsel John O'Shaughnessy only preserved evidence when there was a case

actually pending and not when anticipated. 6/29/2021 Deposition of John O'Shaughnessy 310:20-311:5.

210.    J&J did not retain any samples of its talc ore or milled talc used in its talc-based cosmetic products, which it tested regularly, albeit insufficiently, for the presence of asbestos and asbestiform minerals at any time until 2017. *See* 10/18/2018 Deposition of James Mittenthal 405:22-407:9, 424:2-425:7.

211.    The entries on the J&J privilege log indicate that samples of talcum powder used in litigation existed at the time the litigation in the 1970s, 1980s, and 1990s was pending, but those samples were destroyed. *See id.* at 93:17-94:16. The relevance of those samples was acknowledged by J&J internally on numerous occasions.

212.    Although litigation was pending and anticipated, the samples chosen by J&J specifically to create test results were not retained under the company's evidence retention schedules and were not subject to any litigation-hold. *See id.* at 371:14-374:9, 384:8:387:4, 405:22-407:9.

213.    J&J's failure to institute a litigation hold also made certain that the testing results were destroyed in accordance with its document retention policy. *See id.* at 405:22-407:1.

214.    At all times relevant to this current lawsuit, J&J has been in complete control of all aspects of the domestic and foreign subsidiaries implicated in its talc, including, but not limited to, the testing of talc source ore mines and testing of finished Johnson's Baby Powder end-products. J&J knew, or should have known, that this material would be material in pending and anticipated cases alleging injury resulting from exposure to its talc products and, therefore, had a duty to preserve that testing evidence. J&J destroyed those testing results and discarded its samples of talc.

215.    J&J failed to preserve talc samples maintained in its museum after 1982 when the

museum was suspended, even though litigation was pending and anticipated at that time. *See* 7/12/2018 Deposition of Margaret Gurowitz 157:24-159:17.

216.   J&J did not instruct its consultants that repeatedly tested its talc ore and products to retain the samples tested, even though litigation was pending and anticipated. *See, e.g.*, 7/12/2018 Deposition of Margaret Gurowitz 158:12-159:16. Although J&J was acutely aware that it was McCrone's policy to dispose of samples 30 days after testing results were generated, it never instructed McCrone to retain any samples, including the samples specifically tested for purposes of litigation. *See, e.g.*, 1/28/1987 McCrone Letter at JNJTALC000387715.

217.   J&J failed to retain all test results for the presence of asbestos and asbestiform minerals of the talc ore and milled talc used in its talc-based cosmetic products. *See* 10/18/18 Deposition of James Mittenthal 405:22-406:24.

218.   Even after a litigation hold was finally issued, J&J failed to retain samples from its Worldwide Talc Survey. *See* JNJNL_000015761 (10/20/2000 Letter).

219.   From the 1950s to the 2000s, Defendant J&J (or outside laboratories, including RJ Lee, and McCrone) tested samples of talc for asbestos content.

220.   Upon information and belief, Defendant J&J failed to ensure the preservation of these samples, TEM grids, count sheets, photomicrographs, and other documents generated during the testing and, as a result, the samples, TEM grids, count sheets, photomicrographs, and other documents generated during the testing were destroyed.

221.   Any test results that J&J has not yet produced are presumed to be destroyed, as the disposal of these results were mandated by the company's evidence retention scheduled absent a litigation hold, which J&J never issued. *See id.*

222.   In addition to final testing results, J&J failed to preserve any of the original

scientific data underlying these results. Besides failing to retain the actual talc ore and milled talc samples, Johnson & Johnson did not retain photomicrographs, count sheets, or TEM grids and knowingly allowed for this evidence to be destroyed.

223.    This missing scientific data is of utmost importance to the fair and proper vetting of J&J's defense. The limited underlying scientific data that still exists confirms that the reports of "no detectable" asbestos are belied by the underlying scientific data, which shows evidence of asbestos. *Compare* page 1 *with* pages 4 and 10 in 11/26/1990 McCrone letter to Michael J. Keener Re: sample analysis. There are countless similar non-detect letters with no underlying data.

224.    Plaintiff is clearly hampered in the ability to prove their case by the intentional destruction of the samples and underlying testing data as evidenced by the fact that the underlying data that mistakenly avoided the shredder proves that the tests, which J&J asserts were negative, found that J&J talc was contaminated with asbestos. *See* ¶ 163.

225.    The destruction of the underlying testing data is not limited to McCrone but extends to all outside consultants hired by J&J. For example, while the University of Minnesota found asbestos in J&J talc while litigation was pending against J&J, the photomicrographs underlying the reported findings of asbestos minerals are missing. *See* 3/6/2019 Deposition of Susan Nicholson 333:8-23.

226.    In 1989, after facing litigation related to its talc-based products for nearly two decades and anticipating further litigation, J&J intentionally destroyed records relating to its Hammondsville, Vermont mining operations. *See* JNJ 000240739 (11/23/1993 Denton to Ashton and Jones at p. 3).

227.    J&J has represented that "[i]f we had any reason to believe our talc was unsafe, it would be off our shelves immediately." 12/19/2018 Johnson & Johnson Ad.

228.     Yet in the *Joly* case, J&J's Medical Services Department – including the company's Medical Director–recognized that the plaintiff, who had used Johnson's Baby Powder for years, had "scarring of lung tissue [that] was noted on x-ray." Furthermore, "Pulmonary function studies revealed very severe obstruction of the small airways. Consumer did not respond to bronchodilators. Talc crystals were identified in the consumer's sputum." *See* 2/15/2019 Deposition of Nancy Musco 155:18-158:25; *see also* JNJ 000058414 (5/10/1985 J&J Ingestions and Inhalations Memorandum).

229.     Besides this report, J&J has not located its records related to the Joly litigation even though Mr. George Lee, a Johnson & Johnson scientist, had a file on the case in his possession as late as July 1988. *See id*. at 170:16-172:20. Yet, J&J's designated corporate representative concerning the history and substance of prior litigation was not supplied with a single piece of paper regarding the *Joly* case. *See id.* at 159:21-161:11.

230.     Evidence indicates that J&J historically preserved no records whatsoever from the majority of cases in which it has been sued for causing talc related injuries.

231.     For those cases where there is at least some documentation, J&J either lost or destroyed most of the material evidence related to historical litigation alleging asbestos-related disease from its talc-based products. *See e.g.*, 3/8/2019 Deposition of Nancy Musco 361:24-362:17 (missing *Westfall* photographs); 2/15/2019 Deposition of Nancy Musco 232:9-17 (missing *Edley* interrogatories); *id.* at 111:23-112:3 (no records from the *Cunningham* case); *id.* at 112:10-25 (no records from the *Kreppel* case); *id.* at 113:12-114:3 (no records from the *Lopez* case); *id.* at 114:19-22 (no records from the *Sheldon* case).

232.     Despite being involved in countless cases dating back to 1971, J&J could only locate two sets of discovery responses for its corporate representative to review. *See id.* at 202:2-

13.

233.     In this litigation, J&J has repeatedly asserted the relevance of its communications with the FDA concerning the safety of talc. J&J once maintained a paper file documenting all of its telephone conversations with the FDA related to its talc-based cosmetic products dating to the early 1970s. *See* 2/19/2019 Deposition of Susan Nicholson 48:9-15. The "FDA Call File" was destroyed while litigation was pending depriving all future litigants, including the Plaintiff herein, of the evidence concerning J&J's extensive discussions with the FDA. *See id.* at 113:25-114:19.

234.     J&J once maintained toxicology information in boxes and binders. This toxicology information contained in those files was never disclosed and apparently missing.

235.     William Ashton, otherwise known within J&J as "Mr. Talc," was intimately involved in issues affecting the safety of talc for the entire length of his career at J&J spanning many decades. As part of his responsibility, Ashton maintained his own set of files concerning J&J talc. Those files concerning talc and asbestos maintained by William Ashton, while litigation was pending remain unaccounted for. *See* Note from Rebecca Farlow to William Ashton with a "list of TALC files from the last case."

236.     According to J&J, McCrone was the primary outside consultant charged with testing J&J talc for asbestos. The original McCrone testing files were sent to in house counsel while litigation was pending. Instead of producing those files to litigants alleging talc related injuries, the files were secreted away in the offices of outside counsel. *See* Letter Dated 1/3/1995; 6/29/2021 Deposition of John O'Shaughnessy 24:10-25:1, 155:12-156:3, 251:14-252:13. When some McCrone testing results were finally produced after 2016, the complete McCrone the files secreted away in the offices of outside counsel were not produced. Virtually all of the underlying scientific data was either lost or destroyed.

237.     Defendant J&J intentionally failed to preserve relevant documents generated in litigation in a number of cases filed against it between 1960s to the 1990s.

238.     J&J not only destroyed and covered up evidence, but it also hid the evidence from Courts and litigants for more than 40 years.  In the process, evidence was lost and/or destroyed. *See* 3/8/2019 Deposition of Nancy Musco; 6/30/21 Deposition of John O'Shaughnessy; 6/12/91 Deposition of Roger Miller; 4/26/1983 Deposition of Peter Gale; 3/16/1983 Deposition of Glenn Hemstock in Westfall; 10/19/18 Deposition of James Mittenthal; 7/23/2019 Barden Hopkins Trial Tr.; Affidavit of Roger Miller, *Miller v. A.C. & S, Inc.*, No. ACV884-1087 (Summit Cnty. Ct. Comm. Pls.); 7/7/2016 Affidavit of John Hopkins.

239.     At the time of Plaintiff's exposure to Defendants' Asbestos Products, Defendants knew, or in the exercise of ordinary care should have known, that the potential hazards of their Asbestos Products were not obvious or otherwise known to ordinary users such as Plaintiff, or those working with or around him.  Defendants had a duty to warn Plaintiff, and those working with and around him, of any information regarding the potential dangers of asbestos and the proper methods of handling and working around asbestos and asbestos-containing materials.

240.     Defendants had a duty to exercise reasonable and ordinary care to the Plaintiff. Defendants negligently breached that duty in one, some, or all of the following respects:

    a.  Defendants failed to adequately warn Plaintiff that Asbestos Products, contained asbestos and that exposure to such asbestos-containing products could be injurious to his health;

    b.  Defendants failed to adequately warn Plaintiff that the ordinary handling, use, and servicing of their Asbestos Products would cause asbestos to become airborne and could be injurious to his health;

c.   Defendants failed to provide with their Asbestos Products necessary information regarding how Plaintiff could and should protect himself from asbestos in connection with the use of their Products, including safe handling and use, appropriate protective clothing and equipment, and other protective measures;

d.   Defendants failed to take reasonable steps to provide Plaintiff with information regarding the danger of exposure to asbestos in connection with their Asbestos Products, when those Products were being used or serviced by others;

e.   Defendants failed to provide warnings to Plaintiff regarding the danger of past exposures to asbestos in connection with the use of Defendants' Asbestos Products as additional information regarding the dangers of asbestos became available to them;

f.   Defendants failed to exercise reasonable care to develop, publish, adopt and disseminate safe methods of service, handling and installing asbestos containing materials in connection with their Asbestos Products having undertaken to develop, publish, adopt and disseminate other information regarding the service, handling and installation of such materials;

g.   Defendants failed to use reasonable care to ensure that their Asbestos Products were only distributed to, serviced and/or handled by entities and individuals who had been sufficiently trained in their safe use;

h.   Defendants failed to provide accurate information to Plaintiff and other members of the public regarding the dangers of asbestos and their Asbestos Products by advertising, labeling and otherwise;

i.   Defendants further negligently misrepresented, affirmatively and by omission,

that the Asbestos Products they manufactured, sold, or distributed were safe in their ordinary and foreseeable use, when such representation was untrue;

j.  Defendants failed to provide to Plaintiff the information that they provided to their own employees regarding the hazards of asbestos and their Asbestos Products;

k.  Defendants failed to test their Asbestos Products and/or failed to disseminate the results of tests that they did conduct;

l.  Defendants failed to warn or advise Plaintiff and others to cease all future exposure to asbestos, fumes, smoke, dust and fibers, and to keep away from the home environment asbestos dust and fibers on work clothes and tools;

m. Defendants failed to develop and to place on the market non-asbestos containing materials that were reasonably available to them;

n.  Defendants' Asbestos Products were used in the manner in which they were intended to be used, however, Defendants' Asbestos Products failed to perform their purposes safely, in that they caused Plaintiff to develop terminal asbestos cancer, lung cancer and/or other asbestos-related diseases.

241.   Plaintiff's injuries are a direct and proximate result of the Defendants' negligence as described above and Plaintiff has suffered damages as described herein.

242.   Plaintiffs demand damages and trial by jury on all issues so triable in this cause.

## **COUNT II – STRICT LIABILITY**

243.   Defendants placed the asbestos products on the market and in the stream of commerce.

244.   At the time the asbestos products left the Defendants' possession, they were

defective because they were unreasonably dangerous and caused damage to humans, specifically mesothelioma.

245.     The defects made these asbestos products unreasonably dangerous for their intended use or for any use the Defendants could have reasonably foreseen.

246.     Plaintiff's injuries are a direct and proximate result of the defects in Defendants' asbestos products described above and Plaintiff has suffered damages as described herein.

247.     Plaintiffs demand compensatory damages and trial by jury on all issues so triable in this cause.

## COUNT III – PRODUCTS LIABILITY

248.     The Defendants sold, furnished, manufactured, designed, formulated, or supplied asbestos products to NELSON or others for compensation.

249.     At the time NELSON encountered the asbestos products, the asbestos products were being used in the manner for which they were designed and intended.

250.     At the time of the exposure, the asbestos products were being used by a person for whose use they were intended.

251.     The Defendants knew or had reason to know that the asbestos products were, or were likely to be, dangerous for the use for which they were intended and supplied.

252.     The Defendants had reason to believe that NELSON, and those for whose use they were supplying the asbestos products, would not realize the danger.

253.     The Defendants failed to exercise reasonable care to inform NELSON of the danger.

254.     NELSON is the person to whom the Defendant supplied the asbestos products, or someone Defendants should have expected would use the asbestos products with the consent of the

person or entity to whom it was supplied, or someone the Defendants should have expected would be endangered by the probable use of the asbestos products.

255.    The asbestos products were the proximate cause of some damage to Snyder.

256.    The nature and extent of that damage.

257.    During the course of his lifetime, JONATHAN E. NELSON was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating talcum powder which were manufactured, sold or distributed by the aforementioned Defendants.

**COUNT IV – FEAR OF DEATH AND CONSCIOUS PAIN AND SUFFERING**

258.    As a result of his exposure to asbestos and subsequent diagnosis of mesothelioma, decedent, JONATHAN NELSON, endured great physical pain and suffering, mental anguish, loss of enjoyment of life, and fear of death.

259.    Plaintiff brings this instant count for decedents conscious pain and suffering and fear of death as per *Nelson v. Dolan*, 230 Neb. 848.

260.    Prior to his death, decedent was consumed by his fear of death and fear of the future, he knew this was a terminal disease and that he would ultimately succumb to this lethal form of cancer caused by exposure to asbestos. This fear of death severely limited Decedent's everyday life depriving him of his ordinary pursuits and enjoyment of life.

261.    As a direct and proximate result of the negligent, careless and reckless acts of the Defendants, Decedent suffered from conscious pain and suffering prior to his death from mesothelioma.

262.    Decedent expended sums of money for medical care, treatment for his asbestos-related disease. Prior to his death, Decedent was prevented from pursuing his normal activities and employment and has been deprived of his ordinary pursuits and enjoyment of life. Decedent has

suffered pecuniary losses as a result of his asbestos-related injuries.

## COUNT V - WRONGFUL DEATH

263.    The Estate of the decedent was liable for and, in fact paid for hospital, medical, funeral and burial expenses and charges for the decedent.

264.    The Decedent left surviving his spouse, HEATHER NELSON, and at the time of his demise and by reason of the wrongful death of Decedent, Decedent's survivors have suffered pecuniary losses.

265.    There is, and at the time of the illness hereinabove set forth, there was a force and effect in the State of Nebraska a death statute known and designated as Neb. Rev. St. 30-809, 30-810 and Plaintiff brings this action pursuant to provisions thereof for the benefit of the next of kin of Decedent.

266.    As a direct and proximate result of the negligent, careless and reckless acts of the Defendants, Decedent suffered from mesothelioma which resulted in his death and the Decedent and heirs-at-law, have suffered injuries including, but not limited to emotion pain, suffering and distress, loss of companionship, guidance, services, advice, counsel and comfort, pecuniary loss, including medical and funeral expenses and other expenses for administration of the Estate and other items of damage recoverable under the Wrongful Death Acts.

## DAMAGES

267.    As a direct and proximate result of the Defendants' negligence and defective products as described above, Plaintiff contracted mesothelioma diseases, which have caused Plaintiff to suffer great and lasting physical pain and mental anguish.

268.    Each exposure to asbestos as a result of Defendants' negligence and/or defective

Asbestos Products caused and contributed to Plaintiff's injuries. Plaintiff's injuries arose out of, were connected to, and were incidental to, the manufacture, sale and distribution by Defendants of their Products.

269. As a direct and proximate result of the conduct described, Plaintiff has been obliged to spend various sums of money to treat his disease and injuries. Plaintiff remains obligated for such expenses. As a direct and proximate result of Defendants' negligent conduct and defective products, Plaintiff's enjoyment of life and earnings capacity has been impaired, and his life expectancy shortened.

## DEMAND FOR JURY TRIAL

270. Plaintiffs demand trial by jury on all issues.

Dated: January 19, 2024

<div style="margin-left:40%">

By:   /s/ Justin High
      Justin High #23354
      High & Younes, LLC 6919 Dodge Street
      Omaha, Nebraska 68132
      Ph:    402-933-3345
      Fax:   402-933-3020
      Email: justin@hyattorneys.com
      *Attorneys for Plaintiff*


By:   /s/ Perry Shusterman
      *To be admitted PHV*
      Meirowitz & Wasserberg LLP
      1040 6th Avenue, Ste 12B
      New York, NY 10018
      Ph:    212-897-1988
      Fax:   646-432-6887
      Email: perry@mwinjurylaw.com
      *Attorneys for Plaintiff*

</div>